IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MILDRED G. VURNS,                           §
                                            §
          Plaintiff,                        §
                                            §
V.                                          §        CIVIL ACTION NO. H-04-1969
                                            §
JOANNE B. BARNHART                          §
COMMISSIONER OF THE SOCIAL                  §
SECURITY ADMINISTRATION,                    §
                                            §
          Defendant.                        §

**MEMORANDUM AND ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment (Document No. 13), and Memorandum in Support (Document No. 14), Defendant's

Motion for Summary Judgment (Document No. 15), and Memorandum in Support (Document No.

16), and Plaintiff's Reply thereto (Document No. 17).   After considering the cross motions for

summary judgment, the administrative record, and the applicable law, the Magistrate Judge

ORDERS, for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is

DENIED, Defendant's Motion for Summary Judgment is GRANTED, and the decision of the

Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on August 5,
2004.  (Document No. 11).

## I. Introduction

Plaintiff Mildred G. Vurns ("Vurns") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for supplemental security income benefits ("SSI").  According to Vurns, substantial evidence does not support the ALJ's decision, and the ALJ, Gerald L. Meyer, committed errors of law when he found that Vurns has the residual functional capacity ("RFC") for sedentary work, restricted to the extent that Vurns

> can stand/walk for 2 hours in an 8-hour day; sit for 6 hours in an 8-hour day; and carry/lift 5 pounds occasionally.  She can never climb stairs, ropes, ladders, or scaffolding.  She can occasionally balance, stoop, or crouch.  She can never kneel or crawl.  She can perform simple routine work with simple instructions.  She can only have limited contact with the public due to her antisocial feelings

and could perform work as an assembler, a sorter, or as a lens inserter.  (Tr. 18, 21).  Vurns seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claim for further proceedings.  The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Vurns was not disabled as a result of her impairments, that the decision comports with applicable law, and that it should therefore be affirmed.

## II. Administrative Proceedings

On March 1, 2001, Vurns applied for supplemental security income benefits claiming that she has been unable to work since January 1, 1999, as a result of lupus and a bad back.  (Tr. 15, 16, 69-71).[2]  The Social Security Administration denied her application at the initial and reconsideration

---

[2] "Tr." refers to the transcript of the administrative record.

stages. (Tr. 25-26). After that, Vurns requested a hearing before an ALJ. (Tr. 39-40). The Social Security Administration granted her request and the ALJ held a hearing on August 28, 2002 (Tr. 265-272), which was continued to March 6, 2003 (Tr. 273-303), at which Vurns' claims were considered *de novo*. On April 16, 2003, the ALJ issued his decision finding Vurns not disabled. (Tr. 15-22)). The ALJ found at step one that Vurns had not engaged in significant gainful activity since her alleged disability onset date. He further found that Vurns had a back problem, lupus, hepatitis C, borderline intellectual functioning, and a reading disorder, which are severe impairments. Next, at step three, the ALJ found that Vurns' impairments were not severe enough to meet or equal any of the listed impairments in the Social Security Regulations, which would require a finding that she was disabled. At step four, the ALJ concluded that Vurns retained the residual functional capacity ("RFC") to perform work at the sedentary level with restrictions. (Tr. 18, 21). The ALJ further concluded that Vurns could not return to her past relevant work. At step five, based on Vurns' RFC, and the testimony of Ms. Cowen, a vocational expert, the ALJ, using the Medical-Vocational Guidelines as a framework, *see* 20 C.F.R. § 404.1569 & Pt. 404, subpart P, App. 2, Table No. 1, Rule 201.18, concluded Vurns was not disabled because she could perform a restricted range of sedentary work and that Vurns could perform jobs such as an assembler, a sorter, or as a lens inserter, all of which are jobs that exist in significant numbers in the regional and national economy, and that she was, therefore, not disabled within the meaning of the Act.

Vurns sought review by the Appeals Council of the ALJ's adverse decision. (Tr.11). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions,

findings, or conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R. § 404.970, 416.1470.  After considering Vurns' contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on March 26, 2004, that there was no basis upon which to grant Vurns' request for review.  (Tr. 4-6).  The ALJ's findings and decision thus became final. Vurns has timely filed her appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The Commissioner has filed a Motion for Summary Judgment (Document No. 15), and a Memorandum in Support thereof (Document No. 16), and Plaintiff has filed a Motion for Summary Judgment (Document No. 13) and a Memorandum in Support (Document No. 14).  Vurns has filed a Reply to Defendant's Motion for Summary Judgment.  (Document No. 17).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 303 (Document No. 9).  There is no dispute as to the facts contained therein.


## III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits is only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards."  *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence.  42 U.S.C. § 405(g).   While it is incumbent upon the court to

examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§ 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory

diagnostic techniques.  42 U.S.C. 423(d)(3).  The impairment must be so severe as to limit the

claimant in the following manner:

> he is not only unable to do his previous work but cannot, considering his age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which he lives, or whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.

42 U.S.C. 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any

substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992)(quoting *Milan*

*v. Bowen*, 782 F.2d 1284 (5th Cir. 1986).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe" impairment or combination of impairments,
> he will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in
> Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not
> disabled" must be made; and
>
> 5. If the claimant's impairment prevents him from doing any other substantial gainful
> activity, taking into consideration his age, education, past work experience, and
> residual functional capacity, he will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren*

*v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of

proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found at step five that Vurns, despite her impairments and limitations, could perform sedentary work that was reduced only to the extent that Vurns

> can stand/walk for 2 hours in an 8-hour day; sit for 6 hours in an 8-hour day; and carry/lift 5 pounds occasionally.  She can never climb stairs, ropes, ladders, or scaffolding.  She can occasionally balance, stoop, or crouch.  She can never kneel or crawl.  She can perform simple routine work with simple instructions.  She can only have limited contact with the public due to her antisocial feelings.  (Tr. 18, 21).

Then, based on Vurns' age (45), limited education (completion of grade 9), work experience, and relying on the testimony of a vocational expert and the Medical-Vocational Guidelines as a framework, the ALJ concluded that Vurns was not disabled because she could perform sedentary work with restrictions, and could perform jobs such as an assembler, a sorter, or a lens inserter, all of which are jobs existing in significant numbers at the regional and national levels.  In this appeal, the Court must determine whether substantial evidence supports the ALJ's step five finding.  According to Vurns, substantial evidence does not support the ALJ's step five finding because the ALJ failed to offer any meaningful analysis of Vurns' cognitive limitations and the impact of those limitations on her RFC.  According to Vurns, the ALJ should have taken into account that her cognitive limitations, including her ability to respond to and work with the public, co-workers and supervisors; understand and carry out written instructions (including simple); maintain attendance

and punctuality and to be reliable; and respond to work-related stress, including routine changes in work setting, were compromised by her borderline intellectual functioning and reading disorder. Vurns argues that because she had been rated as having only "fair" and "poor" abilities in almost all areas of work related functioning, except for her ability to deal to the public, interact with supervisors, and deal with work stress, which was rated as "poor," she cannot function successfully at any type of competitive employment. In addition, Vurns argues that the ALJ erred by failing to include in his hypothetical questions to the Vocational Expert the full panoply of Vurns' psychological limitations, which impact upon her ability to engage in substantial gainful employment. The Commissioner responds that the ALJ's RFC determination is supported by substantial evidence especially given that none of the impairments alleged by Vurns were as totally debilitating as alleged. With respect to Vurns' physical impairments, the Commissioner argues the record shows that Vurns' hypertension is stable (Tr. 109-110, 143-149, 202); her hepatitis C is controlled as evidenced by the recent liver biopsy that revealed no fibrosis or inflamation (Tr. 246-258); and Vurns' back pain was caused by a strain and she had no signs of other back problems. (Tr. 243, 256, 109). In addition, according to the Commissioner, the ALJ appropriately incorporated *all* the impairments supported by the record into his RFC determination. Implicit in the RFC determination was the ALJ's consideration of Dr. Whitley's psychological evaluation. The limitations in question, as supported by the record, were also included in the hypothetical questions posed to the testifying vocational expert.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence of pain

as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren,* 925 F.2d at 126. Any conflicts in the evidence are to be resolved by the ALJ, and not the Court. *see Newton v. Apfel*, 209 F.3d 448, 452 5th Cir. 2000) (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

## V.  Discussion

### A.  Objective Medical Evidence

The medical records show that Vurns has complained of and been treated for a bad back, lupus, Hepatitis C, borderline intellectual functioning, reading disorder and hypertension.  Because Vurns had applied for SSI benefits, she underwent an examination by Donald Gibson II, M.D, on June 19, 2001.  (Tr. 107-110).   The results of Vurns' physical examination  reveal  that her blood pressure was well controlled (110/78).  Vurns was described by Dr. Gibson as "a pleasant female in no apparent distress." (Tr. 108).   With respect to his examination findings, Dr. Gibson wrote:

> ABDOMEN:  Benign, nontender with positive bowel sounds.  Liver, spleen, and kidneys are not palpable.  There are no palpable masses.
>
> BACK:  There is some lower paraspinal muscle tenderness in the lumbar region. Forward flexion is limited to 30 degrees and extension and right and left opening 10 degrees.  Heel to toe and tandem walk were poor.  Squat was poor.
>
> NEUROLOGIC:  There is no localized sensory loss, muscle weakness, or atrophy. Cranial nerves two through twelve are intact.  Gross mental status is clear.  Peripheral reflexes were normal.  Romberg is negative.
>
> EXTREMITIES:  No clubbing or cyanosis.  Peripheral pulses are two plus and intact. Peripheral joint exam reveals no objective swelling or deformity.  The joints were tender.  Both kneees have 100 degrees of flexion of full extension.

Based on the results of his examination of Vurns and the results of a complete blood count, Dr.

Gibson opined:

>  1. Back Pain. Patient apparently has chronic back pain from previous Workman's Compensation related injury in 1994. The level of pain appears to be slightly exaggerated. There are no old records to document disc damage or arthritis. Patient walked very slowly in the office setting and cannot perform heel to toe and tandem walk or other maneuvers. She used a cane for support but it is not obligatory. I would recommend further x-rays and testing to confirm spinal disorder. There is no loss of reflexes or evidence of radiculopathy.
>
>  2. Systemic Lupus. Unconfirmed. No evidence of renal failure or internal organ damage.[3]
>
>  3. Hypertension. Stable. No renal, cardiac, or neurological complications. (Tr. 109-110).

In addition, the results of a Hepatitis Study that Vurns had on August 8, 2001, reveals that she tested positive for Hepatitis. (Tr. 160). Vurns underwent a liver biopsy on July 11, 2002. The biopsy results revealed only "focal mild lobular inflammation, clinically HCV. No fibrosis." Vurns had a negative hepatitis study on July 26, 2002. (Tr. 248).

With respect to Vurns' allegation that she was unable to work due to a bad back, besides Dr. Gibson's findings described above, the records show that Vurns was treated by Ben H. Echols, M.D., an internist specializing in gastroenterology. According to Dr. Echols' treatment notes, Vurns often complained of back pain/spasm, and was prescribed medications such as Vicodin and Flexeril for management of chronic pain. (Tr. 169, 171, 174, 178, 179, 180, 181, 184, 185, 186, 190, 193, 194, 199, 202, 203, 204, 205, 206). On November 11, 2000, Dr. Echols' completed a physicians' statement in which he described Vurns' prognosis as "good." (Tr. 185).

With respect to hypertension, the medical records suggest that Vurns' hypertension was well

---

[3] Other than Dr. Gibson's reference to lupus, there are no other medical records relating to lupus in the record.

controlled through the use of hypertensive medication.[4]   In addition, the medical records show that

Vurns underwent an upper GI procedure on May 12, 1999, which was otherwise unremarkable

except for a "mucosal deformity and spams of the duodenal bulb consistent with peptic ulcer disease."

(Tr. 141).  Also, Vurns had vision problems and was treated by an ophthamologist.  (Tr. 130-139,

122).  Vurns experienced wrist pain and sought treatment at an emergency room.  (Tr. 124-128).

X-rays of her wrist were normal.  (Tr. 129).  She was released with a diagnosis of musculosketetal

pain and given ibuprofen for pain.  (Tr. 125).  The medical records further show that Vurns

complained of tongue and face problems.  The results of a neurologic exam which was performed on

August 3, 2000, revealed she was neurologically intact.  Vurns' range of motion was 5/5, her deep

tendon reflexes were 2T, and she had normal sensory touch.  (Tr. 158).   In March 2002, Vurns

sought medical attention.  The results of blood tests results were normal (Tr. 238-240, 222-223), she

had a normal ECG (Tr. 234-235), a chest x-ray showed no evidence of acute cardiopulmonary disease

(Tr. 236-237),  and an abdominal ultrasound was normal.  (Tr. 219).

    In connection with Vurns' application for SSI, a disability physician completed an assessment

---

[4] Vurns' blood pressure was taken at various times and readings show that Vurns' blood
pressure was controlled with medication.  See (March 3, 2000, 110/86 (Tr. 206); July 24, 2000,
140/100 (Tr. 205); August 3, 2000, 127/82 (Tr. 158); September 15, 2000, 130/92 (Tr. 203);
November 10, 20002, 130/92 (Tr. 203); January 19, 2001, 150/100 (Tr. 202); March 6, 2001,
170/90 (Tr. 199); March 22, 2001, 170/110 (Tr. 229); April 17, 2001, 130/80 (Tr. 196); May 24,
2001, 136/97 (Tr. 225-227); June 8, 2001, 130/90 (Tr. 194); June 28, 2001, 140/82 (Tr. 193);
August 15, 2001, 132/86 Tr. 157); August 17, 2001, 120/60 (Tr. 190); October 15, 2001, 130.80
(Tr. 186); November 6, 2001, 91/65 (Tr. 151); November 13, 2001, 110/70 (Tr. 184); November
20, 2001, 119/76 (Tr. 224); December 7, 2001, 120/80 (Tr. 181); January 11, 2002, 128/67 (Tr.
148); February 13, 2002, 152/96 (Tr. 147); February 18, 2002, 112/72 (Tr. 180); March 18,
2002, 110/70 (Tr. 179); March 26, 2002, 117/80 (Tr. 221); May 23, 2002, 124/111 (Tr. 173);
June 21, 2002, 120/60 (Tr. 171); July 23, 2002, 110/76 (Tr. 249); July 26, 2002, 145/91 (Tr.
246);  August 5, 2002, 159/103 (Tr. 169); August 14, 2002, 142/79 (Tr. 262); October 4, 2002,
114/78 (Tr. 258); December 3, 2002, 128/82 (Tr. 256); January 3, 2003, 136/86 (Tr. 244);
January 10, 2003, 114/82 (Tr. 242); and January 29, 2003, 170/90 (Tr. 254). .

of Vurns' residual functional capacity on July 6, 2001.  According to the assessment, Vurns could

occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or

walk at least 2 hours, sit for up to 6 hours and was not restricted for pushing and/or pulling.  In

addition, the physician assessed that Vurns should never climb ladders or ropes but occasionally could

climb ramp and stairs, balance, stoop, kneel, crouch, and crawl.  Finally, the evaluator concluded that

Burns had no manipulative, visual, communicative or environmental restrictions.  (Tr. 112-119).

Also, in connection with her SSI application, Vurns participated in a five day work evaluation.

In a report dated October 3, 2002, the evaluator summarized about Vurns' capacity as follows:

> Ms. Vurn[s] is of employable age, has limited education, and last worked as a shirt
> presser which involved light physical exertion.  Medical information indicated that she
> has been diagnosed with chronic low back pain, hypertension, depression and anxiety,
> and has a history of Hepatitis C.  There is no mention in the medical records regarding
> claims of arthritis or that she has problems with blackouts, dizziness, nausea, stomach
> distress, headaches, or suicidal thoughts.  During evaluation observations were made
> of swollen finger joints and finger stiffness characteristic of persons with arthritis.
> Problems with blackouts, dizziness, nausea, stomach distress, or headaches were not
> observed during this brief work evaluation.

> Assessment of physical capacity for work revealed that Ms. Vurn can sit for 30
> minutes to 1 ½ hours at a time, can stand for 10 to 20 minutes, can walk slowly with
> a cane for about 300 feet but not without fatigue, and can lift 5 pounds but cannot
> carry this amount. She cannot perform work tasks requiring overhead reach, bending,
> kneeling, squatting, or crouching.  She demonstrated poor hand grip strength and
> pinch grasp and had difficulty with finger manipulation and agility due to swollen and
> stiff fingers on both hands.

> Ability to reason as measured by the Beta III indicates low average intelligence.
> However, her ability to follow and record simple to detailed instructions was poor
> because of language deficits.  Her reading comprehension score was at the 4th grade
> level.

> Work performance revealed that her highest scores were on making monetary change
> and on light bookkeeping tasks.  She also demonstrated above average accuracy in
> sorting mail and average accuracy in recording telephone messages - but with poor
> spelling.  She demonstrated average gross manipulative abilities (such as would be

required of a shirt presser), average eye-hand-foot coordination, and above average accuracy in performing simple repetitive packaging, work involving counting as well. Lowest scores were on filing tasks and performing tasks requiring fine motor and manipulative abilities. Her overall performance appeared to be above those of a 4th grade reading level.

Occupational adjustments ranged from poor to good with worse ratings for withdrawn and non-communicative behaviors and best ratings for following work rules and maintaining work focus. Personal social adjustments ranged from fair to good with demonstrated improvements over time. Performance adjustments indicated that client can follow simple instructions.

While Ms. Vurn[s] presented psychiatric symptoms on the first day of evaluation, it appeared that the magnification of the symptoms was due to not having taken her medications. On the following days, her behaviors improved dramatically. Her physical impairments appeared to be more critical. The physical capacity assessment appeared to be a reasonable estimate of her current functional status. (Tr. 104-105).

With respect to treatment that Vurns has received for borderline intellectual functioning and reading disorder, the medical records show that Vurns received outpatient treatment at the Harris County Medical Authority on August 5, 2001. (Tr. 157). According to the treatment notes, Vurns was "here to speak to a Dr. about depression." (Tr. 157). She had a follow up appointment on September 22, 2001. (Tr. 154). In connection with her application for SSI, Vurns underwent a psychological evaluation on September 30, 2002, by Jim C. Whitley, Ed.D., a clinical psychologist. (Tr. 209-217). According to the evaluation, Vurns provided a detailed history and provided information regarding her functional abilities. In addition, Vurns was given several tests including the Bender-Gestalt Visual Motor Test, Wechsler Adult Intelligent Scale-Revised, Wide Range Achievement Test, Trail Making Tests A and B, Minnesota Multiphasic Personality Inventory, Thematic Apperception Test, and Rorschach Inkblot Technique. Based on the results of these tests, as well as on Vurns' history and his interview of Vurns, Dr. Whitley opined that Vurns had a reading disorder, disorder of written expression, adult antisocial behavior, and adjustment disorder with

13

depressed mood at Axis I.  Overall, Vurns had a GAF of 55 or "moderate symptoms."  As to Vurns'
prognosis, Dr. Whitley wrote:  "the patient's motivation toward working is highly suspect  She has
been unemployed since the onset of the injury in 1994.  So it does not appear as though her
motivation to work is that good."  (Tr. 215).  In addition, Dr. Whitley completed a form called
"Medical Assessment of Ability to do Work Related Activities (Mental)" in which he evaluated
Vurns' mental ability to perform activities based the following criteria:

> unlimited or very good:  ability to function in this area os more than satisfactory
>
> good:  ability to function in this area is limited but satisfactory
>
> fair:  ability to function in this area is seriously limited but not precluded
>
> poor:  ability to function in this area is almost absent
>
> none:  no useful ability to function in this area.  (Tr. 216).

Applying this rating scale, Dr. Whitley assessed Vurns' ability to make occupational adjustments,
make performance adjustments, and make personal/social adjustments.  Overall, Dr. Whitley opined
that Vurns' ability to make such adjustments was "fair" in 11 areas, was borderline "fair/poor" in 3
areas and was "poor" in 1 area.   In particular, Vurns was rated as "fair" in the following areas:
follow  work  rules,  relate  to  coworkers,  use  judgment,  function  independently,  maintain
attention/concentration, understand, remember, and carry out detailed but not complex job
instructions, understand, remember, and carry out simple job instructions, maintain personal
appearance, behave in an emotionally stable manner, relate predictably in social situations, and
demonstrate reliability.  Vurns was rated "fair/poor" in the following areas:  deal with the public,
interact with supervisors, and deal with work stress.  Lastly, Vurns was rated "poor" with respect to
her ability to understand, remember, and carry out complex job instructions."  (Tr. 216-217).

Vurns argues that the ALJ's RFC is not supported by substantial evidence because he failed to take into account her cognitive limitations and how these limitations affect her RFC.  According to Vurns, the consulting psychological evaluation that was prepared by Dr. Whitley demonstrates that she has no more that a "fair" or "poor" ability to function in almost all areas, and  relying on a decision by the Tenth Circuit Court of Appeals in *Cruse v. United States Dept. of Health & Human Services*, 49 F.3d 614, 618 (10th Cir. 1995), which held that a physician's rating of "fair" was evidence of disability, Vurns argues that the ALJ erred by not including all of these limitations in her RFC.  The Commissioner, on the other hand, argues that the ALJ's RFC finding is supported by substantial evidence and that the ALJ appropriately accommodated for the limitations noted by Dr. Whitley.

Unlike the Tenth Circuit, the Fifth Circuit has not equated a rating  of "fair" to be evidence of disability, and the Tenth Circuit's decision in *Cruse* is not controlling in this circuit.   Indeed, no other circuit has adopted  the Tenth Circuit's reasoning  in *Cruse*.  For example, the Eighth Circuit in *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) wrote: "[t]he word "fair" is both a measure of ability and disability.  It is on the balance between poor ability to function and greater ability to function.  A physician's use of the term "fair" does not, on its own, declare that the claimant cannot return to past work.  Rather, the term "fair" requires a review of the entire record  in order to judge whether the balance tips toward functional ability or toward disability."  In this case, upon this record, the objective  medical  evidence  factor  supports  the ALJ's finding that Vurns had the  residual functional capacity to perform sedentary work with restrictions.  The ALJ's RFC determination included all of the mental and physical impairments that he found were supported by the record.  Given the medical records, the work evaluation, and the mental assessment prepared by Dr. Whitley,

as well of the testimony of the vocational expert and of Vurns, the balance in Vurns' case tipped

toward functional ability, not disability.

**B. Diagnosis and Expert Opinions**

The second element considered is the diagnosis and expert opinions of treating and examining

physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion,

diagnosis, and medical evidence of the treating physician, especially when the consultation has been

over a considerable amount of time, should be accorded considerable weight."  *Perez v. Schweiker*,

653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however,

the opinion must be more than conclusional and must be supported by clinical and laboratory findings.

*Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir.

1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment

will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with ... other substantial evidence.'"  *Newton v. Apfel,*

209 F.3d 448, 455 (5th Cir. 2000)(quoting *Martinez,* 64 F.3d at 176).  As such, if the treating

physician's opinion is deficient in either respect, then it is not entitled to controlling weight.  The

opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.

*Id*.  "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports

a contrary conclusion.'"  *Martinez v. Chater,* 64 F.3d 176 (5th Cir. 1995)(quoting *Bradley v. Bowen*,

809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical

sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'"  *Martinez*

*v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995).

Even if an opinion of a treating physician is not entitled to controlling weight because it was

16

not consistent with the other substantial evidence of the record and was not well supported by medically acceptable clinical and laboratory diagnostic techniques, the opinion nonetheless is still entitled to deference and must be weighed in light of the following factors:

(1)  the physician's length of treatment of the claimant,

(2)  the physician's frequency of examination,

(3) the nature and extent of the treatment relationship,

(4)  the support of the physician's opinion afforded by the medical evidence of the record,

(5)  the consistency of the opinion with the record as a whole, and

(6)  the specialization of the treating physician.

*Newton*, 209 F.3d at 456.

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately.  The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.  The ALJ wrote:

The Administrative Law Judge also observes that the claimant has a poor work history and may not be motivated to work as mentioned by Dr. Whitley.  In the work evaluation report of October 2002, the claimant exhibited erratic behavior on the first day, but her behavior improved dramatically on the next 4 days.  The evaluator assessed that behavior as stemming from the claimant not taking her medications.  The medical assessment of ability to do work related activities (mental) completed by Dr. Whitley in September of 2002, did not preclude simple, sedentary work.  It also noted that the claimant did not need the cane.  At C-9F/4, a letter from Dr. Hood, an orthopedist, stated that there was no need for addictive dangerous mind-altering medications since the claimant only had a simple lumbar strain as shown on a MRI done 7 years before.  (Tr. 18-19).

None of the medical opinions submitted support the conclusion that Vurns was disabled as a result

17

of a back problem, lupus, hepatitis C, borderline intellectual functioning and a reading disorder.  In light of the medical records submitted, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The third element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook v. Heckler*, 750 F.2d 391, 395 (5th Cir. 1985).  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 860 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

At the administrative hearing, Vurns testified about her health and its impact on her daily

activities.  She offered no testimony or corroboration from her family or friends with respect to her

complaints about her condition.  According to Vurns, she has "been having issues with my muscle

spasms, my blackouts, and my memory loss mostly, because I can't remember too much.  I swell up.

My  hands swell, my feet swell, and they ache real bad, so I just – you know, every time I try to use

my hands, they swells up real bad and ache." (Tr. 279-280).  With respect to depression and anxiety,

Vurns testified that she "still [goes] through it sometime." (Tr. 280).  According to Vurns, she does

no housework, no grocery shopping, does not drive and basically does not leave her house. (Tr. 280-

281).  Vurns further testified that she "don't too much like people.  You know to confront me with

all kinds of stuff.  I don't too much associate." (Tr. 281).  Based on the reasons which follow, the

ALJ rejected Vurns' testimony as not fully credible:

> During the hearing, the claimant testified that she has muscle spasms, black outs, memory loss, and her hands and feet swell and ache.  She doesn't leave the house much.  She doesn't do housework or shopping.  She doesn't drive, but she did have [an] accident during a blackout and lost her license.  Her friend does the shopping and cleaning.  She doesn't go out much because she doesn't like to be around people.  She was on Worker's Compensation from 1995-1998.  Really on from 1994-1995, and then on medical for 5 years - that just ended.  She hasn't had any surgery except outpatient for female problems.

> The issue raised by the claimant's allegations is not the existence of pain but rather the degree of pain or other subjective symptoms which the claimant experiences.  The undersigned does not [find] the claimant's symptoms to be as severe as she has alleged.  The objective clinical findings (although not the only factor to be considered) do not support the degree of pain and functional limitations which the claimant alleges.  Although the claimant's problems may be expected to produce mild chronic pain or discomfort, the medical records do not show repeated hospitalizations or aggressive forms of therapy (such as surgery or treatment at a pain clinic) that would be expected if [she] experienced severe, persistent, and unremitting pain.

> The medical record does not show serious muscle weakness, muscle spasm, atrophy, weight loss, or other signs of progressive physical deterioration which might be expected when an individual experiences intense and continuous pain or leads an inactive lifestyle as the claimant alleges.  The claimant's pain and other symptoms

appear to be brought on or aggravated by strenuous exertional activities, such as prolonged standing or walking, associated with heavy work and not by the less strenuous activities associated with medium or light work. The claimant's medications appear to be effective and do not produce any adverse side effects. No examining physician has indicated that the claimant is unable to work with reasonable, logical, and credible supporting medical signs or findings.

Considering the record as a whole, the Administrative Law Judge concludes that the claimant may experience some of the subjective symptoms to which she testified but not to the degree alleged. The claimant's testimony is an overstatement of her subjective symptoms and functional limitations and is only generally credible. (Tr. 17-18).

The Court finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History and Age

The fourth element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that Vurns was forty-five years old at the time of the administrative hearing, and she attend school through the ninth grade. (Tr. 283). Vurns had no past relevant work or transferable skills. (Tr. 21). Based on the objective medical evidence, the ALJ questioned Patricia Cowen, a vocational expert, at the hearing about Vurns' ability to to engage in gainful work activities. The ALJ posed a series of comprehensive hypothetical questions to the vocational expert which incorporated all of Vurns' exertional and non-exertional impairments. The ALJ asked the Vocational

Expert to consider the following hypothetical questions:

Q. Okay. Now, assume for me an individual who's 45 years old, with at least a ninth grade education. We have a reading disorder, so the reading skills would be limited; able to stand or walk two hours in an eight-hour-day or sit for six; lifting or carrying about five pounds occasionally; never stairs, never ropes, ladders, or scaffolding; occasionally stopping, occasionally balancing, occasionally crouching; never kneeling, never crawling; no reaching overhead; mentally limited to a simple, routine work environment, and should only have limited contact with public. Do you need any of that repeated?

A; No, sir.

Q. Okay, could such an individual do any of the past work that she's indicated?

A. No.

Q. Then if they're 45 years old with that ninth grade education and has a reading problem, so assume limited ability to read, using the same limits, I just gave, would there be any other work which would exist in the region or national economy for such a person?

A. Yes, sir. I would reduce because of the reading the sedentary, unskilled base recognized by the Commission by maybe 10%. That would eliminate one cashier job and maybe an order clerk position. Examples of other work activities that are compatible with that would be telephone - did you say anything about the public? I don't think-

Q. Limited contact with public.

A. Limited? Okay, I'd take out that then. Assembler, sorter, lens inserter are three examples of work activities that are compatible with that.

Q. And those are all sedentary, unskilled?

A. Yes, sir.

Q. Do you have the numbers for those?

A. Two thousand plus of each of those in this region, Harris County and surrounding counties; times five for the state; times 20 of that for the nation.

Q. Would any of those jobs be reduced because of that no reaching overhead?

A.  No, sir.

Q.  Okay.  Does your testimony conform with the DOT?

A.  Yes, sir.

Q.  Except as you noted up - with at security -

A.  Security work.  (Tr. 283-284).

The record further shows that Vurns' attorney questioned the Vocational Expert about Vurns' cognitive limitations, and in particular, about Vurns' ability to sustain and maintain work in light of her limitations.

Q.  Ma'am, there's some - you had testified that the claimant's past relevant work was as a presser, stocker, and a security guard.  I'm a little bit serious, though, is there anything in the record that would lead you to believe that any of those jobs were performed at SGA?

A.  Well, they're unskilled so it - I can't really tell.  I can tell what the angle is, and the answer would be no.  However, for the short term, for a month or two months, then perhaps so.  I don't know because I don't have her month-by- month earnings -

Q.  All right.

A.  – so I, I can't answer that.

Q.  Okay, if, if we were to assume hypothetically that her testimony was correct - and granted her memory is very poor that far back.

A.  Sure.

Q.  But if her testimony were correct and her - she never made over about $500 a month, then none of these jobs would be SGA.

A.  Well, when it was 500 back - I think it was 500 back in those days.  I think it's been raised now to 700, if I'm not mistaken.  So when it was 500, it would be.

Q.  Let me see.  You could be right about that.

*               *               *

22

Q.  Okay, got you. And, let's see, we have an exhibit, C-6F/8 and C-6F/9 - do you have a copy of that by the way?

A.  I do.

Q.  Okay.  The evaluator here had indicated in basically every category that was rated, in fact every category that was rated, in these work-related-type functions that the claimant's ability to function was at  best seriously limited but not precluded.

A.  Yes, sir, I saw that.

Q.  And then some of the categories, the limitation was, one particular it was four, which would be ability to function is almost absent.

A.  Right.

Q.  And then several - there was kind of a - middle of the between fair and poor, the checkmark was kind of in the middle of the two squares.  Indicating to me, I think, that she - those abilities would be somewhere between fair and poor.  And my question is if we were to assume, if we were to place those restrictions as indicated in C-6F/8 and 9, if we were to take those and add those to his Honor's hypothetical.

A.  Yes.

Q.  --and would that in any way affect your opinion as to either availability or the number of jobs that would be available?

A.  Certainly this is a profile for an individual who will function at below-average rate and capacity overall, I would guess.  I would like to go over the ratings, though, that you pointed out, and I, I hadn't noticed that those checkmarks were right on the line, but I'd like to address that.

Q.  Okay.

A.  The checkmarks that are between fair and poor are dealing with public, stress, and supervision.  And work skills that are unskilled, you have a novel (sic) amount of stress, so I wouldn't view that as being prohibitive.  The supervisors it's indirect because you've got the same routine sort of work.  The poor rating under complex jobs is not - job instructions - is not what we're looking at.  We're looking at simple jobs, simple work activities, as well as the public, and that being between fair and poor, of course, we took out those jobs.  So what I, I would suggest from this profile is that it would definitely be a below average individual, but it does not preclude in any work activities.

Q.  So it would not intervene even - erode any of the jobs that you - the availability of any of the jobs that you had indicated?

A.  I don't think it would erode.  What, what we tend to see with the profile that we have is a below average employee.  And that may mean that they, they certainly can go and obtain jobs, as we have seen - the temporary services or whatever.  The factors of wanting to work, the factors of needing to work, and all the other extraneous things that drive people to work are what come into play in whether or not they are strong or not so strong, and that's going, in my opinion after reading this record, to determine whether or not she stays employed.

Q.  Okay, so you're saying it's more an issue of would she be able to maintain employment–

A.  Exactly.

Q.  – than would she be able to acquire.

A.  Right.

Q.  Okay.  Now, in, in any of those jobs you said - ability to relate to coworkers, would, would that be a big factor?

A.  No.

Q.  Would that be something that's important?

A.  No.  When you, when you do unskilled work, you go, you sit, and you do it.  And we're looking at sedentary jobs, so it's going to be repetitive.  She did some, by the record, I think it - in one of the records, she talked about doing envelope stuffing.  Well, you don't need to talk to anybody to do envelope stuffing.  You just need to sit there and do it.

Q.  Well, what about the jobs that you identified?  The assembler, the sorters -

A.  I think they're, they're in the same category.

Q.  Same thing?  Okay.  So even a poor ability to deal with coworkers, that would not affect

A.  I didn't see a poor ability with coworkers.

Q.  Okay.

24

A.  It was fair in my opinion.

Q.  Did you - let's see here - Exhibit C-7E/4 under occupational adjustment indicates - do have that exhibit, by the way?

A.  I do.

Q.  Okay.  I'm sorry to bounce right on.

A.  Not a problem.

Q.  It says under relate to coworkers in, in this evaluation which I believe was by a different examiner–

A.  Right.

Q.  — indicated there's a poor ability there.  Would that - if we were to assume that that correct - I guess each evaluator has a little bit different opinion, but -

A.  Well, that's true, and I think - my question is where did this come from.  I had never seen a vocational evaluation that has a quantitative way of addressing these issues, and I didn't see in this record that there was a quantitative assessment on her ability to do that.  It was more of a subjective assessment based on coming in by date.  Not going over that, deal with coworkers.  She didn't communicate with others.  There are people that would be real happy not to have unskilled workers not communicating with others.  What we saw in the report, for example, down - personal social adjustments, improved over time.  So as she was there initially she had a very rough time of it for whatever reason, but then over time, as she became acclimated and accustomed to the process, she improved.  And I don't know the reason for that but, that goes back to what I said previously about the, the work elements, following work rules and all of that, not being precluded.  If we had  [seen] a number of – even two or three in the, in the poor area, for example, on the second page of that report, reliability or relating in a, in a predictable manner emotionally, or emotionally stable manner, if we had seen poor ratings in that at the unskilled level, then that would be - that would probably preclude employment, but we don't have that here.

Q.  Or for example, poor ability to deal with work related stress maybe?

A.  Well, again, you're you're talking about unskilled work, so I mean if there's no ability to deal with stress at the unskilled level, then, then that would tend to preclude it.

Q.  So if it was almost absent, would that preclude it?  The ability to deal with work-

related stress?

A.  Almost absent, no.

Q.  That you not –

A.  No.

Q.  – preclude it?

A.  No.  Again we have overall a very below average profile.  But it's not below average enough to preclude any of the unskilled work that we've addressed.

Q.  Okay, so then on Exhibit 7E, page 4, we see relate to coworkers, deal with public, and deal with work-related stress, we see poor in all three of those categories.  Specifically it says with work stress, does not have adequate focus.  So you're saying even a combination of those three factors would not even –

A.  Well –

Q.  – erode the –

A.  – on, on the prior exhibit, on 6F, you have a definition of poor.  I didn't see a definition of poor and fair in this report, did you have that or –

Q.  No, actually, I don't believe we do.

A.  So

Q.  Now, it does, it does tend to use the same scale.  I mean we see the same –

A.  Yeah, I noticed that.

Q.  Yeah.  So that would be an assumption, but – I guess you're right, (inaudible) it was an evaluation done at the request of the Administration, so one could assume that everyone's on the same page with definition, but that's – you know, we shouldn't assume things.  I, I just have one other question for you.

A.  Yes, sir.

Q.  Well - actually two.  The, the numbers you gave in the 2,000 range, you had told his Honor prior to that that those jobs would be eroded by about 10%.  Was -

A.  So - no the -

Q.  – the 2,000 number before or after?

A.  The sedentary, unskilled base.

Q.  As a whole.

A.  As a whole.

Q.  Okay.

A.  I would -

Q.  Okay.

A.  I would reduce by that amount, just because of the limitation regarding reading and taking out any cashiering jobs that might be at that level or any order clerk, just to remove the writing.

Q.  Okay.  Now, how would assembler, sorter, lens inserter, how important are fine hand coordination and ability to sue small tools?

A.  Manual - this is manual dexterity.  This is finger dexterity.  This is fine finger dexterity.  Fine finger dexterity is not part of the, the requirements for this type of thing.  You do have manual dexterity, motor coordination, which is this, and then finger dexterity.

Q.  What about eye-hand coordination? I mean wouldn't that consist of whether you were doing a fine motor skill or -

A.  No, eye-hand coordination has nothing to do with any of these.  Eye-hand-foot coordination, rather.  I'm sorry.  Eye-hand coordination certainly has some -

Q.  Okay.

A.  – bearing on it.

Q.  How important is that eye-hand coordination in these jobs that you have identified?

A.  Well, you don't really need to be coordinated to assemble two things or three things or to mark something or stick something in.  I don't, I don't really know how

27

to answer that.

Q.  Okay, I mean if you're on an assembly line, assembling products or inserting lens, you're going to have a pretty good number of items coming at you, and you –

A.  Well, if you're assembling anything, you do have to have enough coordination to assemble them.  Right.

Q.  Right.

A.  But in terms of, of - for example one of the, the exercises they gave her was the eye-hand-foot coordination, which requires a delicate balance of a board where you're taking a ball bearing and trying to avoid a maze with holes in it.  All right.  That is, is a fine motor activity because of the balance necessary.  That's not required when you're sitting there and simply putting together two or three pieces.  Are you referring to a particular work?

Q.  Yeah, I'm, yeah, I'm a little bit confused, because on Exhibit C-7E, page 3, you see (inaudible) her percentile was 2.  It says poor accuracy, very slow speed, making monitary change or using mental calculations.  Then down below it says fine hand, eye - fine eye-hand coordination using small tools poor, poor, and then repetitive seven-step assembly tasks, said assembly rating was poor, and there was the same -

A.  The - let me explain -

Q.  Okay.

A.  - the, the Crawford small parts, and then I'll tell you how it applies.

Q.  Okay, thank you.  I appreciate it.

A.  The Crawford is a board about six inches by six inches.  On one side there is about 10 rows of 10 holes, about the size of a pencil lead.  You pick up with a pair of tweezers, a little pin that's about half inch long, and just a little bit smaller than that opening, and you drop the pin into that hole, and then you count up, and then you use a percentile ranking.  On the other side, you have small - you have the same - well, not quite an many, maybe eight, ten rows of eight - small screws that you insert into holes that have threads, and you use a very small screwdriver.  That tends to get in more to fine finger dexterity, and an individual can do that - for example, we see when giving that test a lot of machinists, and a lot of construction workers who do very poorly because their hands are big, and they don't have the ability to get very light touched work activities done.  So having that has no real bearing on taking your fingers in a more gross manner and inserting or plugging or pulling and twisting.

Q.  Okay, now that, that stout U-bolt assembly, would that not be a kind of larger item assembly test?

A.  You know, I'm not real familiar with that.  Where is that?

Q.  That's on C-7E, page 3.

A.  C-7E, page 3.

Q.  Right.  It says repetitive seven-step assembly task, stout U-bolt assembly.  It's my understanding that that's the test of one's ability to deal with larger items rather than the fine (inaudible)

A.  That, that's more what we're talking about.

Q.  Okay.  They rated her poor –

A.  The assembly -

Q.  - in that category as well.

A.  For assembly, just simply - the only comment that I would have is that what you're doing is you're looking at whether or not there's an interest in doing it versus ability, and that's, that's a distinction.  And I, I can't really address that.  If her, if her functional ability with her best effort is poor, then it would again put her into that below average category that we're talking about.

Q.  But yet some of these categories he gave her average accuracy -

A.  Right.

Q.  – and some he gave her above average.

A.  Right.

Q.  You see, in other categories, so wouldn't that lead you to believe that perhaps she was doing the best she can?  Why would she try harder at one task than another?

A.  Well, even in the, in the ones where she has average to above average accuracy, you see a slow pace.

Q.  Right.

A.  Her pace is slow throughout.  And that's going to - that doesn't mean that she can't do it.  That means that her pace is slow, and, and I don't have any way on the U-bolt or the eye-hand-foot coordination or the the, the Valpar (phonetic) eye-hand-foot - or the whole body range of motion  There, there's no way to tell whether an individual is simply slow or is slow and can't.  There's, there's not a distinction.  There's not a mechanism for really testing that.  That's a subjective assessment.  Now, you can write down the score, but you can, you know – again what we have throughout this is some ability performed at a slow pace throughout.  I mean, I think everything that she did was basically at a slow pace.

Q.  And, now, based on all these factors taken as a whole that you've discussed.  You, you can't honestly tell us that that would not affect her ability to maintain competitive employment can you?  I mean, you certainly –

A.  I will say exactly what I said before, and that is that this is a profile of an individual performing at a below average rate.  It doesn't preclude employment, but it's an individual who is performing at a below average rate, and may well go from job to job.

Q.  Now, would you say the, the first percentile is, is significantly below average?  I mean, we're talking about the very, very bottom of the scale.

A.  That's really slow.

Q.  Right.  So it's entirely likely then that an individual with this type of profile would not be able to do - keep a profession.  Is that not a likely

A.  If we have a - well, let me say this.  I have tested people for over 18 years, and I've used this test, and I've tested everything from orthopedic problems to mental problems - people with mental problems to organic mental problems to cerebral palsy to MS, and to score in the one percentile is extraordinarily slow without having, for example, cerebral palsy, without having severe MS.  I don't understand that kind of performance separate from having those sorts of severe limitations.  So again, all I can comment on is that, yes, every performance was below average pace, and I don't know why.  And I won't presume anything except that we have an individual who has performed work activities in the past, and why she has gone from one to another, I'm not sure.

Q.  You say every category is - but that's not the case.  I mean, some of the categories she was rated in were -

A.  Well, there was one for average speed, I see.

Q.  Right.

A.  But overall, my assessment is that she performed at a, at a below average or slow work pace.

Q.  So you're suggesting them that that would indicate to you that there was a deliberate attempt not to -

A.  No, not at all.  I'm just saying that overall the profile is an individual who worked at a below average pace.

Q.  And you're saying, you can't, based on your educational experience, you cannot explain why that is.  I mean that's -

A.  I'll, I'll say what I've said before.  On some of these where the percentile is 1%, for example on the eye-hand coordination or the Crawford, I have never seen a result that low without some sort of severe physical - in my 18 years of testing - without some sort of severe physiology associated with it.

Q.  Okay.  Now, how, how important is following oral instructions to the type of work that you've indicated?

A.  Well -

Q.  I mean any kind of oral instructions.

A.  Because you're talking about unskilled work activity, it's somewhat important, because you usually give them and show them once or twice, and then that's it. There's not a real need for ongoing instruction, as you would have with more detailed,  more complex work instructions.

Q.  So we're dealing with very, very simple instructions.

A.  Certainly.

Q.  Okay.  And, once again, we see on C-7E/3, ability to follow oral instructions rated as poor.  The percentile was 10.

A.  I saw that.

Q.  Very, very low.  So, and, and I understand that you have some reservations about the findings in this report, but -

31

A.  I'm not arguing with them.  I, I think they're valid in as far as they, they go.  I think the question for the judge is, is simply how to, how to apply these results to the other information in the file.

Q.  Well, I understand that.

A.  And I -

Q.  I mean it's, it's up to the judge to assess the credibility and the validity of the study.  I, I understand that completely, but what I'm, what I'm trying to establish from you is based on your - hypothetically based on your training and experience.  If, if his Honor were to find that this was an accurate assessment, is it your opinion that the results in, in whole, would not be likely to reduce one's ability to competitively compete in the workplace?  That's all I'm trying to find out.

A.  Well, I think, again it's a below average profile, and certainly that impacts on an individual's ability to work and sustain work.

Q.  Okay, but you can't say –

A.  I [can't] say how much.

Q.  Okay.

A.  - you know, it depends on all of the other factors that I've alluded to.

Q.  So you can't, for example, give an erosion of the work force or anything like that.

A.  Well, what I would say is that if, if motivation and need and all that were extremely low with his profile, I would say that this individual isn't going to work.  If it were extremely high, then I would say that this person could, could work at a low average to somewhat below average rate.  I mean that would be my professional opinion of this.

Q.  Okay, and now you keep - your bring up motivation.  I'm not sure, once again, if this is an accurate profile.

A.  Right, I'm, I'm just saying, as I said earlier on with Exhibit - I forget the number now - it's 6F, page 8, when we talked about that, that this does not preclude employment, but it's based on all the intangibles that we don't have like motivation, desire, and that sort of thing.  And I, I don't have anything to assess that, and no way to assess it.  If it's very, very low and extremely nominal, then this individual is not going to work.  If it's very high, and, and there's a strong drive and a strong need,

then this individual is not precluded at all from work.  So I think it's the intangible. This is a very borderline rating, and it's like sitting on a fence.  It could go either way.

Q.  But -

A.  It's which way it goes, and I can't judge because I don't know the intangibles.

Q.  Okay.  You say it's borderline, but looking at the report on its face, it's, it's well within - in, the lower extreme of the spectrum.

A.  Well, it's below average.

Q.  In the low, low, low average.

A.  It's certainly below average.

Q.  Significantly below average.

A.  Absolutely.  (Tr. 285-301).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  `The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala,* 36 F.3d 431, 436 (5th Cir. 1994).  Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling v. Shalala*, 36 F.3d 431, 436

(5th Cir. 1994).  Here, as set forth above, the ALJ afforded Vurns' representative this opportunity, and Vurns' representative questioned the VE about the work evaluation report that had been prepared on October 3, 2002.  It is undisputed that the work evaluation suggests that Vurns' abilities are compromised by her mental limitations.   However, that evaluation, unlike the "Medical Assessment of Ability to do Work Related Activities (Mental)" that was completed on September 30, 2002 by Dr. Whitley, did not provide a rating scale with definitions, and therefore it is unclear from the report what criteria were used to assess Vurns' abilities.  In addition, as testified to by the vocational expert, it would be speculative to assume the definitions were the same as that on the Medical Assessment of Ability to do Work Related Activities (Mental).

Based on the findings of Dr. Whitley, Vurns' overall abilities were "fair" and  were only "poor" in one area, the ability to understand, remember, and carry out complex job instructions, and that this limitation was incorporated in the ALJ's hypothetical.  Here, the ALJ based his assessment of Vurns' RFC, on the function by function assessment completed by the state examiner and on the evaluation prepared by Dr. Whitley.  Moreover, the vocational expert testified about the work evaluation report and about the subjective nature of the conclusions contained therein.  The ALJ  is not required to "address every piece of evidence, he must articulate some legitimate reason for his decision ... [and] build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Vurns was not disabled.  Based on the testimony of the vocational expert and medical records, substantial evidence supports the ALJ's finding that Vurns, even with her abilities being between "fair" and "poor", which suggests that she would be a below average employee, was not precluded  from obtaining work, and the ALJ did not err by not

considering whether Vurns, once employed, could sustain and maintain employment. The Fifth Circuit in *Perez v. Barnhart*, ___ F.3d ___, 2005 WL 1540802 (5th Cir. July 1, 2005) (No. 04-50200) reiterated that the ALJ is *not* required to determine whether the claimant's impairments prevent her from obtaining employment *and* whether the claimant will be able to maintain employment. The Fifth Circuit wrote:

> This court made clear in *Frank* [v. *Barnhart*, 326 F.3d 618 (5th Cir. 2003)] that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Id.* Rather, *Watson* [*v. Barnhart*, 288 F.3d 212 (5th Cir. 2002] requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." *Id.* Without such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination. *See id.*

In the instant action, because Vurns' impairments were not of such a nature that wax and wane, Vurns' ability to maintain employment had been subsumed in the RFC determination and there was no obligation on the part of the ALJ to make specific findings regarding Vurns' ability to maintain employment. *See Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003) (inherent in the definition of RFC is the understanding that the claimant can maintain work at the level of the RFC.). The regulations generally require the ALJ to perform the function by function analysis only with regard to strength demands, not non-exertional limitations, such as mental limitations. *see* 20 C.F.R.

§ 416.945. Because the hypothetical questions contained the functional limitations recognized by the ALJ, the Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Vurns was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in

favor of the ALJ's decision.

**V. Conclusion**

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Vurns was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed.  As such, the Magistrate Judge ORDERS that Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, Defendant's Motion for Summary Judgment (No. 15) is GRANTED and that the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 24th day of August, 2005.

Frances H. Stacy
United States Magistrate Judge